[No. 17941-5-II.   Division Two.   December 19, 1995.]

HAROLD MAYER, ET AL., *Appellants*, v. PIERCE COUNTY MEDICAL BUREAU, INC., *Respondent*.

*Daniel R. Kyler* and *Rush, Hannula & Harkins*, for appellants.

*Jack G. Rosenow, Cheryl A. Asche*, and *Rosenow, Johnson, Graffe, Keay, Pomeroy & Moniz*, for respondent.

418

SEINFELD, C.J. — Dr. Harold Mayer appeals a summary judgment in favor of the Pierce County Medical Bureau in this breach of contract action. Finding that the trial court properly construed the contract, and that Mayer was not entitled to due process before cancellation of his Preferred Provider status, we affirm.

### FACTS

Dr. Mayer practiced internal medicine. In 1966 he became a member of the Pierce County Medical Bureau (the Bureau), a nonprofit health care provider that contracts with physicians and hospitals to provide benefits to its health plan subscribers.

In 1984, Mayer entered into a "Participation Agreement" with the Bureau. Later that year, he entered into a separate "Preferred Participant Agreement" with the Bureau. In the latter, the Bureau agreed to compensate Mayer for his treatment of Preferred Provider subscribers. In turn, Mayer agreed to abide by a series of conditions set forth in six numbered paragraphs in the Preferred Participant Agreement, including:

2. The Preferred Participant agrees to utilization review.[1] To remain eligible for preferred participation, the Participant agrees to practice within the parameters of care established by the Corporation, understanding that such care meets the criteria of medical necessity, and to resolve any differences through binding arbitration as set forth by the Board of Trustees.

---

[1]The term "utilization review" refers to the process of comparing a particular physician's services and charges to the average services and charges for all physicians in a particular area of practice. In this way, the Bureau tracks the cost effectiveness of its health care providers.

The final two paragraphs of the Preferred Participant Agreement provide:

> This Preferred Participant Agreement is in addition to, and does not replace the Participant Agreement between Corporation and Physician filed with the Bureau. All conditions and provisions of the Participant Agreement shall remain binding.

> THIS AGREEMENT shall be continuous unless and until cancelled by either party at any time, by giving thirty (30) days written notice to the other party hereto.

In November 1991, the Bureau's medical director, Lester A. Reid, M.D., advised Mayer that he "ranked very high" in his specialty "in average services and charges per patient, or in specific types of services such as cardiovascular or laboratory services per patient." Recognizing that the statistics may reflect "valid differences" among providers, Reid asked to review the records of particular patients. Mayer complied with Reid's request.

On or before January 27, 1992, Mayer received a copy of his Medical Provider Activity Summary showing the Utilization Review Committee's statistical findings concerning his medical practice. The graphs in this document confirm that Dr. Mayer's "dollar activity" and "services activity" were both high when compared to the specialty average.

On January 27, 1992, the Bureau notified Mayer that his "level of practice [was] too costly" and, therefore, it was cancelling his status as a Preferred Participant as of March 1, 1992. The letter said that the Bureau based its decision to terminate on the information it had gathered and evaluated during the utilization review process, and that the cancellation did not affect Mayer's participating provider status with the Bureau.

According to Mayer, without the benefit of Preferred Participant status, he could not afford to operate his private practice. Consequently, he closed his office and sought employment elsewhere.

In December 1992, Mayer filed a complaint, alleging, inter alia, that the Bureau's cancellation of his Preferred Participant status breached the parties' contract. The parties filed cross motions for summary judgment. The trial court granted the Bureau's motion with regard to the breach of contract claim on September 20, 1993 and it denied Mayer's motion for reconsideration on October 1, 1993. Mayer appeals these rulings.

## ANALYSIS

■ A trial court may grant summary judgment only if, after viewing the pleadings and record, and drawing all reasonable inferences in favor of the nonmoving party, it finds there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Higgins v. Stafford*, 123 Wn.2d 160, 168-69, 866 P.2d 31 (1994). In construing a written contract, the basic principles require that (1) the intent of the parties controls; (2) the court ascertains the intent from reading the contract as a whole; and (3) a court will not read an ambiguity into a contract that is otherwise clear and unambiguous. *Felton v. Menan Starch Co.*, 66 Wn.2d 792, 797, 405 P.2d 585 (1965).

■ ■ Interpretation of an unambiguous contract is a question of law. *Absher Constr. Co. v. Kent Sch. Dist. 415*, 77 Wn. App. 137, 141, 890 P.2d 1071 (1995). "If a contract is unambiguous, summary judgment is proper even if the parties dispute the legal effect of a certain provision." *Voorde Poorte v. Evans*, 66 Wn. App. 358, 362, 832 P.2d 105 (1992).

## I

### AMBIGUITY IN THE CONTRACT

Mayer contends that paragraph 2 and the final paragraph are ambiguous and conflict with one another. As the nondrafting party, he argues that any ambiguity in the contractual language should be resolved in his favor.

*See Wise v. Farden*, 53 Wn.2d 162, 168, 332 P.2d 454 (1958). Accordingly, he argues that the Preferred Participant Agreement required the Bureau to resolve any dispute arising from the utilization review through arbitration.

A contract provision is ambiguous when its terms are uncertain or when its terms are capable of being understood as having more than one meaning. *Shafer v. Board of Trustees of Sandy Hook Yacht Club Estates, Inc.*, 76 Wn. App. 267, 275, 883 P.2d 1387 (1994), *review denied*, 127 Wn.2d 1003 (1995). A provision, however, is not ambiguous merely because the parties suggest opposing meanings. *Shafer*, 76 Wn. App. at 275. "[A]mbiguity will not be read into a contract where it can reasonably be avoided." *McGary v. Westlake Investors*, 99 Wn.2d 280, 285, 661 P.2d 971 (1983).

The terms of the Preferred Participant Agreement are not inconsistent or ambiguous. Paragraph 2 requires the physician, as a condition to remaining eligible as a preferred provider, to (1) submit to utilization review; (2) practice within the parameters of care established by the Bureau; and (3) resolve any "differences" presumably arising from the utilization review through binding arbitration. The final paragraph, on the other hand, provides that the agreement will "be continuous unless and until cancelled by either party at any time, by giving thirty (30) days notice to the other party hereto."

*St. Yves v. Mid State Bank*, 111 Wn.2d 374, 377, 757 P.2d 1384 (1988), presents a similar issue. The contract there contained a clause allowing for termination of employment at will and another clause setting forth the employee's term of employment. The *St. Yves* court found that the two clauses dealt with two separate contractual rights and that the term clause created only a "presumptive term of employment," which the Bank could terminate by the procedures set forth in the termination clause. *St. Yves*, 111 Wn.2d at 374-75.

Reading the Preferred Participant Agreement as a whole, it is apparent that the contested provisions here, as

in *St. Yves,* govern two separate issues. Paragraph 2 is one of six paragraphs that impose certain conditions the Preferred Participant must satisfy to retain his status. The final paragraph governs cancellation of the agreement, granting *both* parties the right to cancel the agreement upon 30 days' notice. The wording and placement of the contested provisions within the agreement show the parties' intent to trigger the arbitration requirement if and when the Preferred Participant complained about utilization review and the intent that the final paragraph modify the entire agreement, including paragraph 2.

Although the Bureau used its utilization review process to determine that Mayer's "level of practice [was] too costly," Mayer did not pursue his contractual right to arbitration. He did not request arbitration during the utilization review process or after he received notice of cancellation of his Preferred Provider status.

■■ Finally, although an implied duty of good faith and fair dealing is part of every contract, this duty only arises in connection with terms agreed to by the parties. *Badgett v. Security State Bank,* 116 Wn.2d 563, 569, 807 P.2d 356 (1991). As the Bureau did not agree to initiate arbitration, the duty of good faith did not require it to do so. Provisions providing for the at-will cancellation of an agreement, although sometimes harsh, are enforceable in this State. *See Thompson v. St. Regis Paper Co.,* 102 Wn.2d 219, 233, 685 P.2d 1081 (1984). Thus, the trial court did not err in granting the Bureau summary judgment as a matter of law.

## II

### DUE PROCESS: THE BUREAU'S BYLAWS

Mayer also contends that the Bureau's cancellation of the agreement denied him due process rights explicitly guaranteed by the arbitration clause of the Preferred Par-

ticipant Agreement and by the Bureau's Bylaws.[2] As support, he cites two principles of general contract construction: (1) when there is an inconsistency between a general and a specific provision, the specific provision ordinarily qualifies the meaning of the general provision, *Washington Local Lodge 104 of Int'l Bhd. of Boilermakers v. International Bhd. of Boilermakers*, 28 Wn.2d 536, 541, 183 P.2d 504 (1947) (quoting Restatement of the Law of Contracts 327, § 236(c)); and (2) courts favor the interpretation of a writing which gives effect to all of its provisions over an interpretation which renders some of the language meaningless or ineffective. *Newsom v. Miller*, 42 Wn.2d 727, 731, 258 P.2d 812 (1953).

█ Application of these principles, however, is predicated upon a finding that the terms of the contract are ambiguous or inconsistent. *See International Bhd. of Boilermakers*, 28 Wn.2d at 541; *Newsom*, 42 Wn.2d at 731. As the contract terms here are unambiguous and consistent, it would be inappropriate for us to apply these interpretative rules.

Nor do we find merit in Mayer's claim that the Bureau's Bylaws prohibit the cancellation of Mayer's Preferred Provider status without due process. Despite Mayer's assertions to the contrary, the Bureau did not terminate Mayer's membership in the Bureau when it cancelled the Preferred Participant Agreement. Accordingly, article VI, section 6 of the Bylaws is inapplicable.

---

[2]Article VI, section 6 of the Bureau's Bylaws provides:

Expulsion. Any member may be suspended from membership in the corporation by a majority vote of the Board of Trustees of the corporation at any meeting regularly called for the purpose for acts and conduct deemed prejudicial to the best interests of the corporation and members thereof, provided that such member shall first have been served with written notice of the accusations against him and shall have been given an opportunity to produce his witnesses, if any, and to be heard at the meeting at which such vote is taken.

## III

### Due Process: Common Law and RCW 48.43.170

Mayer contends that RCW 48.43.170 codifies previously existing principles of common law due process. That statute provides, in relevant part:

> If a certified health plan uses unpublished criteria to judge the quality and cost-effectiveness of a health care provider's practice under any specific program within the plan, the plan may not reject or terminate the provider participating in that program based upon such criteria until the provider has been informed of the criteria that his or her practice fails to meet and is given reasonable opportunity to conform to such criteria.

RCW 48.43.170(2). Although clearly applicable to the circumstances in this case, Mayer concedes that this legislation did not take effect until 1993, one year after the Bureau cancelled the Preferred Participant Agreement. Nonetheless, he contends that the Legislature's adoption of this statute provides support for his claim that preexisting common law principles required the Bureau to extend Mayer similar due process rights. *See Needelman v. Dade County Medical Ass'n*, 205 So. 2d 17, 19-29 (Fla. Dist. Ct. App. 1967), *cert. denied*, 211 So. 2d 211 (Fla. 1968).

■ Absent contrary legislative intent, statutes are presumed to operate prospectively only. *Adcox v. Children's Orthopedic Hosp. & Medical Ctr.*, 123 Wn.2d 15, 30, 864 P.2d 921 (1993). Mayer offers no authority suggesting that the Legislature intended RCW 48.43.170 to have a retroactive impact.

Mayer's contention that RCW 48.43.170 codifies preexisting common law, while creative, is not persuasive. The only marginal support for this proposition in Washington, *Schroeder v. Meridian Improvement Club*, 36 Wn.2d 925,

221 P.2d 544 (1950), addressed the merits of a by-law provision that cancelled a person's membership for failure to pay dues. The *Schroeder* court concluded that such a by-law provision could be self-executing, but noted that a member facing expulsion for a "crime or misconduct inimical to the organization's being" must be afforded notice and hearing before he can be expelled. *Schroeder*, 36 Wn.2d at 933.

Here, however, Mayer's membership in the Bureau is not at issue; the Preferred Participant Agreement expressly states that it does not supplant the Participation Agreement between the Participant and the Bureau. Similarly, the Bureau's letter of cancellation states that Mayer's Participation Agreement with the Bureau remains intact.

Mayer also cites to cases from other jurisdictions. Those, however, also all deal with the due process rights afforded to a member who is being expelled from an organization, which is not the case here. Thus, they do not support Mayer's theories that the common law recognizes such rights or that RCW 48.43.170 codified preexisting common law rights.

The trial court did not err in determining that the Bureau did not breach its contract with Mayer by cancelling his preferred provider status without first providing notice and an opportunity to be heard. Consequently, we affirm.

BRIDGEWATER and WIGGINS, JJ., concur.